## U S WEST COMMUNICATIONS, INC., Plaintiff,

v.

## AT & T COMMUNICATIONS OF THE PACIFIC NORTHWEST, INC.; MCIMetro Access Transmission Services, Inc.; Sprint Communications Company, L.P., a limited partnership; The Public Utility Commission of Oregon and Roger Hamilton, Ron Eachus and Joan H. Smith, as members of the Public Utility Commission in their Official Capacity, Defendants.

### No. Civ. 97–1575–JE.

United States District Court,
D. Oregon.

Dec. 10, 1998.

Lawrence H. Reichman, Chin See Ming, Perkins Coie, Portland, OR, Sherilyn C. Peterson, Kirstin S. Dodge, Perkins Coie, Bellevue, WA, Norton Cutler, U.S. West Communications, Inc., Denver, CO, for plaintiff U.S. West Communications.

John F. McGrory, Mark P. Trinchero, Keith L. Kutler, Davis Wright Tremaine, Portland, OR, Daniel M. Waggoner, Kraig

L.M. Baker, Davis Wright Tremaine, Seattle, WA, Maria Arias–Chapleau, Rebecca B. De-Cook, AT & T Communications of the Pacific Northwest, Inc, Denver, CO, for defendant AT & T Communications.

Lisa F. Rackner, Roy Pulvers, Lindsay Hart Neil & Weigler, Portland, OR, Mark B. Ehrlich, Thomas F. O'Neil, III, William Single, IV, MCI WorldCom Inc Washington, DC, Maureen F. Del Duca, Donald B. Verrilli, D. Scott Barash, Douglas H. Hsiao, Jenner & Block Washington, DC, for defendant MCImetro Access.

Eric R. Todderud, Heller Ehrman White & McAuliffe, Portland, OR, David P. Murray, A. Renee Callahan, Wilkie Farr & Gallagher, Three Lafayette Centre, Washington, DC, for defendant Sprint Communications.

Michael T. Weirich, W. Benny Won, Department of Justice, General Counsel, Salem, OR, for Roger Hamilton, Ron Eachus, Joan H. Smith, and Oregon Public Utility Commission.

Philip D. Barz, Emily M. Sweeney, Theodore C. Hirt, Leslie V. Batchelor, U.S. Department of Justice, Civil Division, Washington, DC, Herbert C. Sundby, U.S. Attorneys Office, Portland, OR, for Amicus Curiae Federal Communications Commission.

## OPINION AND ORDER

JELDERKS, United States Magistrate Judge.

Plaintiff U S West Communications, Inc. ("US West") brings this action against AT & T Communications of the Pacific Northwest, Inc. ("AT & T"), MCImetro Access Transmission Services, Inc. ("MCI"), Sprint Communications Company ("Sprint"), the Oregon Public Utility Commission ("PUC"), and PUC Commissioners Roger Hamilton, Ron Eachus, and Joan Smith ("the Commissioners"). The Federal Communications Commission ("FCC") has participated in this proceeding as *amicus curiae*.

The dispute concerns interconnection agreements between U.S. West and AT & T, MCI, and Sprint, respectively. Since the agreements with AT & T and MCI are almost identical, and were considered together by the arbitrator and PUC, they will collectively be referred to as "the AT & T/MCI Agreement" except where necessary to differentiate between them. The Agreement between U.S. West and Sprint ("Sprint Agreement") differs somewhat from the AT & T/MCI Agreement, both in substance as well as its procedural path. The background facts and procedural history are set forth in the prior opinion dated July 16, 1998, which denied defendants' motions to dismiss. The parties have each moved for summary judgment.[1] In addition, AT & T and MCI have filed a joint motion to strike extra-record evidence.

## SCOPE AND STANDARD OF REVIEW

The Telecommunications Act of 1996 ("the Act"), Pub.L. No. 104–104, 110 Stat. 56, 47 U.S.C. § 251 *et seq.*, provides for federal district court review of interconnection agreements concluded pursuant to 47 U.S.C. § 252. "[A]ny party aggrieved" by a decision of a state public utilities commission concerning such an agreement "may bring an action in an appropriate Federal district court to determine whether the Agreement ... meets the requirements of the Act." 47 U.S.C. § 252(e)(6). The Act does not specify either the standard or scope of review.

After some initial hesitation, the parties now generally agree that the scope of this court's review is limited to the administrative record. With regard to the standard of review, it is neither desirable nor practical for this court to sit as a surrogate public utilities commission to second-guess the decisions made by the state agency to which Congress has committed primary responsibility for implementing the Act in Oregon. Rather, this court's principal task is to determine whether the PUC properly interpreted and applied

---

**1.** Upon reviewing the docket sheet, the court discovered that although MCI filed a memorandum requesting entry of judgment in its favor, MCI did not file a formal motion for summary judgment. Since all parties have proceeded un-der the assumption that cross-motions were pending, and there is no prejudice, the court will construe MCI's memorandum (docket 82) as if it were a motion for summary judgment.

the Act, which is a question of federal law that is reviewed *de novo*.

In all other respects, review will be under the arbitrary and capricious standard.

## DISCUSSION

### 1. *Pricing*

#### A. Unbundled Loop Price

The arbitrator established an interim price of $17.20 for an unbundled loop. After this action was commenced, the PUC established a new price of $16.14 in a proceeding known as UM 844. Although the parties refer to this as the "final" price, it is the court's understanding that the $16.14 price may be subject to revision in the future if conditions warrant. Therefore, the court will use the term "UM 844 price" rather than "final price" when referring to the $16.14 rate.

#### (i) US West's Challenge to the Interim Loop Price

Adoption of the UM 844 price effectively moots U.S. West's challenge to the interim price. US West does not seek compensation for the services (if any) that were purchased at the interim price, so the sole remaining question is the price for future services. That will be governed by the UM 844 price (or its successors).

Even if the issue were not moot, this court would affirm the arbitrator's decision establishing the interim price. The PUC began studying unbundled loop prices several years before the Act was enacted. US West actively participated in those earlier proceedings, known as UM 351. When Congress enacted the Act in 1996, it established very short timelines. The arbitrator understandably chose to rely heavily upon the extensive record and analysis that already existed, instead of beginning the process anew.

■ Reliance on those earlier proceedings did not deny U.S. West due process of law. Contrary to the suggestion in U.S. West's brief, the PUC did not apply principles of collateral estoppel to preclude U.S. West from contesting the loop price issue. Rather, the earlier proceedings were treated as evidence that could be considered in the subse-

quent proceeding, and which the arbitrator and the PUC ultimately found were the most reliable evidence then available. US West was free to introduce contrary evidence and to urge a different result.

■ The arbitrator also acted properly in declining to consider the voluminous cost studies submitted by U.S. West just two weeks before the hearing. The arbitrator reasonably concluded that he lacked sufficient time to properly analyze those studies before the applicable deadlines, and also expressed concern about the accuracy of those studies.

#### (ii) U.S. West's Challenge to the UM 844 Loop Price

The court rejects most of U.S. West's arguments concerning the UM 844 price for unbundled loops. The PUC did not err by relying upon the record established in the UM 351, UM 773, and UM 844 proceedings. Nor does the Act require the PUC to ignore its own extensive expertise and experience in overseeing telephone pricing and service in Oregon, and in particular its knowledge of pricing, costs, and related issues as they concern U.S. West.

The parties also dispute the interpretation and application of a stipulation between U.S. West and the PUC. In ¶ 17 of the stipulation, the PUC and U.S. West agreed that in addition to the methodology prescribed in ¶ 16 of the stipulation U.S. West would also submit a study based on the methodology outlined in ¶ 17. The PUC could then compare the results obtained from these two methodologies and decide whether it wished to use the latter method in the future. However, there was no binding commitment by the PUC to use the ¶ 17 methodology in the current round of loop pricing.

A more difficult issue is the number of pairs per drop to be used in calculating loop prices. US West contends that most existing homes employ a two-pair design, though new construction often utilizes a three or even four-pair design. The number of pairs per drop materially impacts the loop price in two respects. First, the total loop investment (*i.e.,* the dividend of the equation) is higher if

the scorched node analysis assumes installation of three pairs per drop instead of two. Second, the divisor in the equation is the number of working loops, which is determined by multiplying the total number of loops times the average fill factor (which measures the percentage of lines or other facilities actually being used, as opposed to the theoretical capacity). US West contends that by assuming three pairs per drop instead of two (*i.e.*, the design that will be used for future construction), but using the existing fill factors which are based on two pairs per drop, the PUC has overstated the number of working loops and thereby understated the total loop investment per working loop. That, in turn, diminishes the price U.S. West receives for the use of its loops.

The PUC insists that U.S. West is bound by the stipulation, and urges this court to resolve the dispute pursuant to Oregon contract law. However, ¶ 16 of the stipulation never mentions the number of pairs per drop, nor is that topic specifically discussed elsewhere in the stipulation. The court also reviewed the relevant portions of the record, but found little evidence that this issue was ever discussed or that any agreement was reached. Rather, the discussions about ¶ 16 focused on whether spare capacity should be treated as a volume-sensitive cost, and whether to use the average or the objective feeder fill factor.

It is possible that the number of pairs per drop was understood by all parties or implied by other paragraphs in the stipulation, but the court has seen no clear evidence of that. Nor is it possible for this court to defer to the PUC's expertise unless the agency actually exercised that expertise. The record demonstrates that with respect to this issue, both in its own proceedings and before this court, the PUC relied almost entirely upon its contention that U.S. West was bound by the stipulation as a matter of contract law. As a result, the agency did not address—at least on the record—seemingly fundamental questions such as whether it is appropriate to apply existing fill factors (which are based on historic drop designs) to the new three-pair drop design, or whether the resulting loop price provides U.S. West "just and reason-

able" compensation for the use of its loops as required by the Act.

Rather than conducting a lengthy trial, at which the parties no doubt would present conflicting testimony regarding the negotiations that led to this stipulation as well as industry conventions, the court will remand this matter to the PUC for reconsideration with instructions to resolve these issues by applying its expertise and the principles delineated in the Act, instead of relying upon the stipulation as a binding contract. As part of that reconsideration process, the PUC may reopen the record to accept additional evidence on this issue.

**B. Resale Discount**

The dispute here concerns the wholesale discount given to AT & T, MCI, and Sprint (collectively, the Competitive Local Exchange Carriers or "CLECs") when purchasing finished services for resale. The arbitrator established an interim discount rate of 22 percent, with the exception of services that already are subject to volume or term discounts on which CLECs will receive either (1) the basic 22 percent wholesale discount, or (2) the existing volume/term discount plus 11 percent, whichever is greater. Thus, if an item is already discounted by 20 percent, then the wholesale discount would be 31 percent (20 plus 11).

This court previously affirmed the arbitrator's decision to use an interim discount rate of 17 percent (in *US West Communications, Inc. v. TCG Oregon*, 31 F.Supp.2d 828) and 18.8 percent (in *US West Communications, Inc. v. Worldcom Technologies, Inc.*, 31 F.Supp.2d 819 (D.Or.1998). Now, however, a different arbitrator has decided that 22 percent is the appropriate discount rate. Since the wholesale discount rate ostensibly reflects U.S. West's cost savings, in theory the rate should be the same regardless of which CLEC is purchasing the services. These variations are therefore troubling. In addition, the effect of the arbitrator's decision is that AT & T and MCI can purchase services from U.S. West at a lower cost than TCG and WorldCom must pay U.S. West for the identical services. In this particular case, the real-world impact is likely to be

minimal, since AT & T recently purchased TCG and WorldCom recently acquired MCI. However, as the PUC gains experience in analyzing cost avoidance data, it will be hard to justify setting different discount rates for each CLEC.[2]

■ US West contends that the 22 percent discount is excessive, and is based upon industry averages and a flawed model generated by MCI, without regard to the specific circumstances of U.S. West's operations in Oregon and whether U.S. West will actually avoid those costs. The court will affirm the arbitrator's decision, because the PUC has represented that this is an interim rate that will be updated once more accurate cost savings data becomes available and is analyzed. US West's concerns can be addressed at that time.[3]

US West's attempt to draw a distinction between costs that are reasonably avoidable, versus costs that are actually avoided, is unpersuasive. The latter would require the CLECs and the PUC to micro-manage U.S. West's operations to ensure that U.S. West actually availed itself of all reasonable opportunities for savings. To the extent U.S. West contends that certain costs are in fact not avoidable, it is merely disputing the PUC's (or the FCC's) determination of what costs are "reasonably avoidable."

The court will also affirm the arbitrator's decision regarding the special discount rate for products that are already subject to volume and term discounts. The Act does not exempt such services, *per se. See* 47 U.S.C. § 252(d)(3). While in all likelihood the existing volume or term discount already takes into account some of the cost savings that could reasonably be achieved from selling the product at wholesale (*e.g.,* billing, marketing), there may still be room for additional savings. The arbitrator therefore reduced the

wholesale discount rate for those products, but did not eliminate the discount entirely.

■ Although U.S. West disputes the PUC's estimate of the additional cost savings that can still be achieved on top of the original discount, that is a factual question which implicates the PUC's expertise. Although less than exact (11% is one-half of 22%), the number selected by the arbitrator is a reasonable compromise until the PUC obtains the data it needs to refine the discount rate further. Again, however, the PUC cannot rely on such estimates forever. It must proceed expeditiously with any studies or hearings needed to determine the additional cost savings that should reasonably result, and adjust the wholesale discount rate accordingly.

US West also objects to discounting residential service, asserting that this service is already priced below cost. The Act does not exempt residential service from the wholesale discount requirement. To the extent a particular service is already priced at or below cost, it is possible that U.S. West will not recoup its entire cost, but that would be true without regard to the wholesale discount. By definition, the wholesale discount is based upon the costs that U.S. West can reasonably avoid by selling the service at wholesale. If no costs can be avoided, then there should be no discount. Consequently, U.S. West's net profit or loss on the service should be the same notwithstanding the wholesale discount. If U.S. West fails to recoup its costs, it is because the discount rate was set too high (which is addressed above), or else because the retail price for the particular service was set too low in the first place. The latter issue does not directly concern the Act or the interconnection Agreement, but must be separately addressed in an appropriate PUC proceeding. For the same reason, there is no taking, since U.S. West's net profit or loss

2. The issue here is the disparity in the discount rate for each CLEC. The PUC is not prohibited from establishing multiple discount rates if a single discount rate would not adequately reflect the range of cost savings that may be achieved for certain products or classes of products.

3. US West complains that the PUC has failed to establish a schedule for reviewing the cost data. That dispute is not presently before this court. However, to the extent that this court's ratification of the PUC's decision is premised in part upon assurances that the PUC will take certain actions at a future date, the court expects the PUC to honor that commitment.

on the particular service should be the same as before the wholesale discount.

### C. Compensation for Calls to Another LEC's System

At issue here is the compensation, if any, that must be paid when a U.S. West customer places a local call to an AT & T or MCI customer, or vice versa. The PUC adopted a bill-and-keep policy, by which each LEC absorbs its own costs and no monetary compensation is paid. US West challenges that decision.

Some of the defendants contend that since FCC rules (and the Act) permit the use of bill-and-keep, that ends the debate. The court disagrees. The FCC rules say only that bill-and-keep (and several alternative methods) are permissible methods. A state PUC must still exercise its discretion to decide whether bill-and-keep is the appropriate method to use in the context of a particular interconnection agreement. *See* 47 C.F.R. § 51.713.

■ Although bill-and-keep may not have been the only permissible decision, the PUC's decision to utilize that method here was reasonable and will not be disturbed by this court. The PUC previously had adopted bill-and-keep as the interim default method to be used until a permanent compensation method was agreed upon. *See* PUC Order 96–021 at 52. That Order contains a detailed explanation of the reasons for the decision, discusses at length the diversity of opinions regarding the best way to provide reciprocal compensation, and outlines the efforts the PUC would make to obtain additional data and devise a long-term solution.

Order 96–021 emphasized that bill-and-keep was to be used "for an interim period of not more than 24 months." *Id.* Subsequently, the PUC confirmed its decision to let all existing bill-and-keep arrangements lapse effective January 12, 1998, but chose to let the parties to each interconnection agreement negotiate their own permanent arrangements instead of the PUC establishing a single method. *See* PUC Order 97–372. The parties have indicated that these negotiations have stalled. If so, then either party may invoke the dispute resolution provisions in the Agreement.

### D. Compensation for Interim Number Portability Costs

Interim number portability ("INP") costs are incurred when a customer switches to another local carrier, but retains the same phone number. Calls to that customer must still be routed through the previous local carrier's network, which then "ports" the calls to the new local carrier's network. US West wants to be compensated for that expense. However, the PUC adopted a bill-and-keep policy under which each LEC absorbs its own costs.

■ The Act specifically delegates to the FCC the task of determining how INP costs should be allocated among "all telecommunications carriers on a competitively neutral basis...." 47 U.S.C. § 251(e)(2). Bill-and-keep is among the methods that the FCC has sanctioned as "permissible." *Telephone Number Portability, First Report and Order,* FCC 96–286, 11 FCCRcd 8352 (July 2, 1996) (*"Number Portability Order"*), ¶ 136. Of course, the PUC must still exercise its discretion in selecting an appropriate method from among those that the FCC has deemed "permissible." While the PUC might have selected some other method, its choice of the bill-and-keep method was well within the range of its discretion, particularly in light of the anticipated short duration of INP (which will soon be replaced by a permanent number portability system).

### E. Division of IXC Access Charges on Ported Calls

When a long distance call is completed, the long distance carrier (known as an "interexchange carrier" or "IXC") must pay an access charge to the LEC at both ends of the call. If the recipient has changed local phone companies but retained his old telephone number, the call must be "ported," which requires the services of both the previous and present LEC who then must somehow divide the recipient LEC's share of the access charge.

US West contends that when it ports a long distance call to a Sprint customer, U.S. West should receive a larger share of the access charge than the PUC awarded it. US West alleges that under the terms of the Sprint Agreement, Sprint gets the lion's share of the access charge even though U.S. West does most of the work.

The arbitrator offered this explanation for his decision:

> FCC Order 96–286 specifies how terminating access revenues should be shared in the context of interim number portability. The FCC determined that neither the forwarding carrier nor the terminating carrier provides all of the facilities and, therefore, terminating access charges should be assessed pursuant to meet point billing arrangements. With regard to "ported" calls, the FCC has ruled that the CLEC should receive the carrier common line (CCL) and local switching charges, and that transport charges should be shared between the ILEC and the CLEC. FCC Order 96–286 at ¶ 140.

Arbitrator's Decision (ARB 10), p. 3. The court has reviewed the relevant provisions of that FCC Order. While the FCC did endorse "meet point billing" principles, the court did not find any directive on the proper allocation of carrier common line (CCL) and local switching charges or transport charges. Perhaps it is implied from the term "meet point billing" and the court simply lacks the technical expertise to read between the lines. However, on its face the FCC order purports only to establish some general principles, *e.g.*, that the LECs should share the access charge consistent with meet point billing principles, but does not define precisely what the appropriate share is in a given situation. The *amicus* brief filed by the FCC supports the court's interpretation:

> Because the FCC's rules do not specify what a fair share would be, the FCC at this time takes no position as to U.S. WEST's specific arguments that the Sprint Agreement fails to divide access charge revenues between the carriers in a manner that is fair or reasonable.

Memorandum of the FCC as *Amicus Curiae* at 19. It is unclear whether the arbitrator made an independent determination that the proposed division of access charges was proper or merely concluded (perhaps erroneously) that FCC rules mandated a particular result.

Rather than speculating as to the reasons for the arbitrator's decision, the court will remand this issue to the PUC for reconsideration (or at least clarification of the basis for the decision).

### F. Special Construction Charges

The AT & T/MCI Agreement requires U.S. West to undertake various construction projects for the benefit of the CLECs. US West contends the Agreement is too vague as to when it will recover its costs, and from who. US West complains that it must bear the risk and cost of financing improvements intended solely for the benefit of its competitors with little assurance of getting repaid in a timely manner. US West also objects to a provision that allows it to recover only "economically efficient charges," anticipating future disputes with the CLECs.

US West has raised some valid concerns, but it is too early to tell whether those fears will actually materialize. For instance, some of those concerns might be addressed by agreeing in advance upon a construction price, which is how such issues are often handled in the private sector. For now, the court will not disturb the PUC's decision. However, if problems do develop that are not satisfactorily resolved, U.S. West is not precluded from revisiting this issue when the contract comes up for renegotiation.

### G. Recovery of Interconnection Start–Up Costs

This issue was not discussed in U.S. West's briefs. Accordingly, the court deems it to have been withdrawn.

### 2. *Recombining Unbundled Elements*

At issue here is whether (1) U.S. West must recombine unbundled elements for the CLECs, and (2) whether the CLECs are entitled to receive elements already-bundled if that is how those elements currently exist in the U.S. West network.

US West's principal concern is that, if forced to recombine "unbundled" elements for the CLECs, it would be providing a finished service at a price far below even the discounted wholesale price for finished services. This would be contrary to the dichotomy (between resale and unbundled elements) that Congress established in 47 U.S.C. § 251(c)(3) and (c)(4), and create a substantial incentive for arbitrage. *See Iowa Util. Bd. v. Federal Communications Comm'n,* .120 F.3d 753, 813 (8th Cir.1997), *cert. granted,* —— U.S. ——, 118 S.Ct. 879, 139 L.Ed.2d 867 (1998). From U.S. West's perspective, by analogy, the CLECs can either order a complete car (and get a wholesale discount from the retail price) or else order the parts (at the unbundled rate) and assemble the product themselves, but the CLECs cannot insist that U.S. West recombine the parts so that they receive a finished car for the price of the unassembled parts.

AT & T responds that the challenged provisions are necessary "to forbid U.S. West from ripping those elements apart solely to raise its potential competitors' costs."

Because the arbitration decision predated the Eighth Circuit's decision in *Iowa Utilities,* this particular interconnection Agreement has never been reviewed to ensure compliance with the principles articulated by the Eighth Circuit. The PUC recently reconsidered its position on rebundling in light of *Iowa Utilities,* and issued PUC Order 98–467 (Nov. 13, 1998), which provides in relevant part that:

> MCImetro and GTE shall remove all provisions in [their] interconnection agreement that require GTE to combine network elements on behalf of MCImetro or which prohibit GTE from separating network elements that GTE currently combines. If the United States Supreme Court issues a decision in *Iowa Utilities Boar* that is inconsistent with this conclusion, the parties may petition to revise the agreement.

*Id.,* p. 3. While that order is not binding in the instant case, the PUC likely would reach

the same conclusion here.[4] Accordingly, the court remands this issue to the PUC for reconsideration and for such further proceedings as it deems appropriate.

### 3. *Reciprocal Access to Poles, Ducts, Conduits, Rights–of–Way*

The AT & T/MCI Agreement allows AT & T and MCI to use U.S. West's poles, ducts, conduits, and rights-of-way. US West wants equal treatment, *i.e.,* the reciprocal right to use AT & T and MCI's poles, ducts, conduits, and rights-of-way. The arbitrator agreed with U.S. West and ordered reciprocal access. The PUC initially agreed with the arbitrator but, upon reconsideration, reversed the arbitrator and decided that the Act expressly prohibits such a requirement.

■ The arbitrator was correct. When a CLEC enters into an interconnection agreement, the Act mandates that both parties provide reciprocal access to their respective poles, ducts, conduits, and rights-of-way. § 251(b)(4). Accordingly, the PUC's decision on this issue is contrary to the Act.

The critical issue is how to reconcile what, at first glance, may seem to be conflicting provisions within the Act. Pursuant to 47 U.S.C. § 224(f)(1), a "utility shall provide a cable television system or any telecommunications carrier with nondiscriminatory access" to its poles, ducts, conduits, and rights-of-way. The term "utility" is defined, for purposes of § 224, as including "a local exchange carrier." However, 47 U.S.C. § 224(a)(5) provides that "[f]or purposes of *this section,* the term 'telecommunications carrier' ... does not include any incumbent local exchange carrier as defined in section 251(h) of this title." (emphasis added).

The net result of § 224 is that an ILEC such as U.S. West is a "utility"—and thus must provide access upon request—but (for purposes of § 224) an ILEC is not a "telecommunications carrier" entitled to make such a request. Therefore, § 224(f)(1) does not authorize U.S. West to demand reciprocal access from AT & T and MCI.

---

4. In addition, there are a myriad of technical and pricing issues relating to recombining (or prohibitions upon separating) elements that implicate the PUC's expertise. The present agreement does not adequately address those issues.

That does not end the matter, however. Pursuant to 47 U.S.C. § 251(b)(4), each "local exchange carrier" has the "duty to afford access to the poles, ducts, conduits, and rights-of-way of such carrier to competing providers of telecommunications services on rates, terms, and conditions that are consistent with section 224 of this title."

■ The FCC reads the "consistent with section 224" language to limit § 251(b)(4) to one-way access, *i.e.*, ILECs must provide access to their facilities but cannot request it. The court disagrees. The FCC's interpretation of § 251(b)(4) would render that paragraph meaningless, since it would merely duplicate the requirements of § 224(f)(1). A cardinal rule of statutory interpretation is that the court must give effect, if possible, to every clause and word of a statute rather than to emasculate an entire section. *Bennett v. Spear*, 520 U.S. 154, 117 S.Ct. 1154, 1166, 137 L.Ed.2d 281 (1997).

The FCC's interpretation also ignores the fact that in drafting § 251, Congress carefully distinguished between the duties it imposed upon all local exchange carriers, § 251(b), versus the additional obligations Congress imposed upon "each *incumbent* local exchange carrier ...." § 251(c) (emphasis added). By including the duty to provide reciprocal access in § 251(b) rather than in § 251(c), Congress clearly intended that this duty would apply to all local exchange carriers and not just the incumbent local exchange carrier. The legislative history confirms this interpretation. *See* H.R.Conf.Rep. No. 458, 104th Cong., 2d Sess., p. 121, *reprinted in* 1996 U.S.Code Cong. & Admin.News 124, 132–33 (duties imposed by § 251(b) apply to all local exchange carriers, including the "new entrants" into the local exchange market).

It might seem odd that Congress denied ILECs reciprocal access under § 224 but allowed them access under § 251. However, upon closer examination, there is a rational basis for this division. The definition of "utility" in § 224 is quite broad, encompassing electrical utilities, cable television operators, and the like. If an ILEC were a "telecommunications carrier" for purposes of § 224(f)(1), then an incumbent such as U.S. West could demand access to the infrastructure of every public utility, regardless of whether it provides local exchange services.

By contrast, the access provisions of § 251(b)(4) are confined to local exchange carriers. Unless a utility affirmatively enters into the marketplace by becoming a local exchange carrier, § 251(b)(4) is inapposite. Once a utility enters the arena, however, the duty to provide access becomes reciprocal. Sauce for the goose is also sauce for the gander.

That interpretation of Act is also logical. Congress saw no reason to force U.S. West to build a new row of telephone poles if AT & T or MCI already have a row of poles running down the same street. Rather, the Act contemplates the sharing of such facilities, which in the long run should minimize the cost to consumers.

The reference in § 251(b)(4) to "rates, terms, and conditions that are consistent with section 224" refers to provisions such as § 224(b) and (c), which specifically discuss "rates, terms and conditions", and § 224(d), which defines just and reasonable rates.[5] The FCC stretches this language past the breaking point when it reads "rates, terms and conditions" to define who is entitled to receive access. Congress has already spoken directly to that question. Section 251(b)(4) mandates that access be afforded "*to competing providers of telecommunications services on rates, terms, and conditions that are consistent with section 224 ...*" (emphasis added).[6]

■ The FCC's proposed interpretation directly contradicts the plain meaning of the

---

5. This is not intended as an exhaustive list. Since the issue has not been briefed, the court also expresses no opinion on what authority the FCC and PUC may have under the "rates, terms and conditions" clause to protect a CLEC against a burdensome request from an ILEC for reciprocal access.

6. The term "competing carriers" as used in this section should not be confused with the term "competitive local exchange carriers." The latter term is not used in the Act.

statute. Consequently, this court will not defer to the agency's interpretation. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–45, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

The FCC will not go down without a fight, however. It contends that this court must defer to the FCC's interpretation of the Act because the agency has articulated its interpretation in paragraph 1231 of a massive order (containing over 1400 paragraphs) covering almost every issue that might arise under the Act. *See Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, First Report and Order,* CC Docket No. 96–98, 11 FCCRcd 15499 (Aug. 8, 1996) ("First Report and Order" or "Local Competition Order"). Specifically, the FCC relies upon 28 U.S.C. § 2342, which provides in relevant part that:

The court of appeals ... has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of—

(1) all final orders of the Federal Communications Commission made reviewable by section 402(a) of title 47.

Therefore, reasons the FCC, this court lacks jurisdiction to review the FCC's order. Assuming, for the moment, that the Local Competition Order even comes within the purview of § 2342, this court is not reviewing the validity of that order but deciding whether the AT & T/MCI and Sprint interconnection agreements comply with the requirements of the Act. Section 251(e)(6) of the Act—which was enacted after § 2342—specifically authorizes this court to make that determination. To the extent there is any inconsistency between § 2342 and § 251(e)(6), the specific grant of jurisdiction in the latter, which was also later in time, controls over the general rule in § 2342.

▮▮ The FCC's interpretation of the Act is entitled to a considerable amount of deference, particularly with regard to technical issues that implicate the agency's expertise.[7]

There also are places in the Act where Congress expressly delegates certain tasks to the FCC. *See, e.g.,* § 251(c)(2) (authorizing FCC to determine rules for allocating cost of number portability).

Nevertheless, the FCC cannot transform *Chevron* deference into absolute deference merely by articulating its interpretation of the Act in the form of a massive Order. Section 251(e)(6) requires this court to determine whether the challenged interconnection agreements comply with the Act. If the FCC is interpreting the Act in a manner that is contrary to its plain meaning, the court's obligation is to follow the language of the statute that Congress enacted.

The PUC shall revise the AT & T/MCI agreement to provide for reciprocal access to poles, ducts, conduits, and rights-of-way.

### 4. *Single Point of Interconnection*

When a U.S. West customer calls an AT & T or MCI customer, or vice versa, the two networks must interact. AT & T and MCI want a single point of interconnection. Regardless of where in Oregon the call originates, or where it is bound, the call must first be routed to that single point of interconnection and then on to its destination. Consequently, even a local call to the next-door-neighbor must be routed through this single point of interconnection, which may be located many miles away or even on the other end of the state.

US West complains that this is a very inefficient way to exchange calls between local networks because it forces U.S. West to route all local calls through its tandem switches and transport them all over town or even the state. Not only is this more expensive, but U.S. West contends that the additional traffic volume will overload the system and require U.S. West to invest in more tandem switches and other facilities.

AT & T and MCI deny that they are using the single point of interconnection to shift costs to U.S. West. Rather, they contend that

---

7. The FCC has advised the court that, with regard to the provisions in the Local Competition Order stating that ILECs are not entitled to reciprocal access to CLEC poles other such facilities, "[t]he Commission did not make this determination on the basis of its own policy judgment. Rather, concluding that Congress itself had settled the matter, the Commission simply tracked the language of the statute." Supplemental Brief of the FCC as *Amicus Curiae*, p. 2.

their method is superior, and the only reason it is more expensive for U.S. West is because the latter has an outdated system architecture. 47 U.S.C. § 251(c)(2) requires an ILEC to:

> provide, for the facilities and equipment of any requesting telecommunications carrier, interconnection with the local exchange carrier's network—
>
> > (A) for the transmission and routing of local telephone exchange service and exchange access;
> >
> > (B) at any technically feasible point within the carrier's network . . .

The FCC interprets this provision to mean that a CLEC can point to any spot in the ILEC's network and say, "I want access here," and the ILEC must assent so long as it is "technically feasible," regardless of cost. *See* Local Competition Order ¶¶ 198, 199, 205, 209. The ILEC can't say, "I prefer to give you access one block over." *Id.* Moreover, if the CLEC wants access at multiple points, the ILEC must provide that access. *Id.* ¶¶ 172, 209, 212.

This case presents a slightly different question: Does the phrase "at any technically feasible point" define (1) the *universe* of possible access locations—which is limited only by technical feasibility—or (2) does it also define the *number* of interconnection locations, meaning only one location is required. Neither the FCC's regulations nor its Local Competition Order answer this question. Nevertheless, the FCC has filed an *amicus* brief urging this court to adopt the second interpretation. Memorandum of the FCC as *Amicus Curiae,* p. 20. However, the first interpretation is the more logical. It is analogous to a policy allowing students to check "any" book out of the library. While that policy could be read to limit the quantity of books that a student may borrow, it is more logical to interpret that policy as defining which books the students may borrow.

The court agrees with U.S. West's interpretation of the statute. Technical feasibility answers the question of *whether* a CLEC may interconnect at a given point, but it does not answer the question of *how many* points of interconnection a CLEC must have.

These are two distinct issues. Indeed, if the word "any" in § 251(c)(2) means "only one," then the Act would prohibit a CLEC from establishing more than one point of interconnection. Moreover, since the word "any" also modifies the term "requesting telecommunications carrier" in § 251(c)(2), then "only one" competing carrier could request interconnection. In the end, the FCC's interpretation of the statute collapses under the weight of its own contradictions.

■ Although the court agrees with U.S. West that the Act does not define the minimum number of interconnection points, the court also rejects U.S. West's contention that a CLEC is required to establish a point of interconnection in each local exchange in which it intends to provide service. That is not legally required, and the cost might well be prohibitive for prospective competitors.

Ultimately, the mechanics of a particular interconnection arrangement are best determined by each state's PUC, which is most knowledgeable about the details of the parties' respective system architecture and local circumstances, subject of course to the standards established by the Act and any FCC regulations (where appropriate).

■ Here, although the PUC approved the AT & T/MCI proposal, it acknowledged that U.S. West had raised some legitimate concerns, but ultimately decided to adopt a wait-and-see approach which allows U.S. West to invoke the contractual dispute resolution procedures if problems do arise:

> The Commission is not persuaded that this issue is ripe for decision. There is no indication that AT & T and MCI intend to establish network interconnections in a manner that will result in the inefficient use of network facilities. We presume that AT & T and MCI will seek interconnection arrangements that enhance, rather than compromise, network capabilities.
>
> The Commission is not prepared to adopt USWC's proposal to require all carriers to interconnect within each local calling area, because we are concerned that such an approach may impair the ability of competing carriers to implement more ad-

vanced network architectures. On the other hand, a reasonable argument can be made that additional compensation should be required of a carrier that seeks to interconnect in a manner that is extremely inefficient or exhausts existing network facilities. If USWC believes a particular request for interconnection will impair network facilities or cause it to incur extraordinary costs, it may seek Commission resolution of the matter under the dispute resolution procedures in the contract.

PUC Order No. 97–003, p. 4 (footnote omitted). The PUC's decision was reasonable and will not be disturbed by this court.[8]

### 5. *Subloop Unbundling*

In addition to purchasing entire loops, AT & T and MCI also want the right to purchase only individual components of a loop, such as the network interface device, drop, distributor cable, feeder cable, etc. US West does not dispute the PUC's authority to order subloop unbundling, but argues that because of network and feasibility concerns, subloop unbundling should only be provided through a bona fide request ("BFR") process. US West contends that the "BFR process is the only means of addressing technical feasibility concerns at all locations within U.S. West's network." US West also alleges that the FCC expressly declined to order subloop unbundling, as a matter of course, precisely because of these technical obstacles (citing Local Competition Order, ¶ 391).

MCI responds that the BFR process would delay access to the subloop for months, whereas U.S. West has immediate access any time it wants, hence it would be discriminatory to use the BFR process. The arbitrator ruled in favor of MCI:

> USWC acknowledges that subloop unbundling is possible, but recommends that such unbundling should be authorized only on a case by case basis through the BFR process. AT & T also proposes use of the BFR process. I agree with MCI that requiring a CLEC to utilize the BFR process for each location where it seeks unbundled feeder or distribution, would unreasonably delay access. Subloop elements should be unbundled unless the LEC can demonstrate that it is not technically feasible. Accordingly, the CLEC should specify those locations where it seeks unbundled subloop elements. If USWC believes that it is not technically feasible to provide unbundled access at certain locations, it should notify the CLEC. If the CLEC disagrees with USWC's determination, the parties should use the dispute resolution procedures set forth in the contract.

Arbitrator's Decision (ARB 3/6), p. 7. The PUC affirmed:

> Issue 16—Subloop Unbundling. USWC argues that subloop unbundling should take place through the bona fide request (BFR) process. We agree with the Arbitrator that the BFR process will cause unnecessary delays in obtaining subloop elements. The procedure approved by the Arbitrator is adopted

PUC Order No. 97–003, p. 5.

During oral argument, defendants assured the court that in the event U.S. West asserts that a particular subloop unbundling request is technically infeasible, the parties will use the contractual dispute resolution process to resolve the issue. What defendants object to is a mandatory 30–day negotiation period for every subloop unbundling request, regardless of whether the request presents any special concerns. With that understanding, the court affirms the PUC's decision.

### 6. *Dark Fiber*

Dark fiber is reserve fiber-optic transmission capacity that is not presently in use. AT & T/MCI want the right to use U.S.

---

8. In determining how many points of interconnection are required, and the compensation payable to the ILEC, the PUC may properly consider relevant factors, including whether a CLEC is purposely structuring its point(s) of interconnection to maximize the cost to the ILEC or otherwise gain an unfair competitive advantage. The purpose of the Act is to promote competition, not to favor one class of competitors at the expense of another. "[A] requesting carrier that wishes a 'technically feasible' but expensive interconnection would, pursuant to section 252(d)(1), be required to bear the cost of that interconnection, including a reasonable profit." Local Competition Order, ¶ 199.

West's dark fiber so they don't have to build their own transmission lines. US West is willing to let AT & T/MCI use its "lit" fiber, *i.e.,* fiber that is already in service, but AT & T/MCI do not want to share fiber with U.S. West since they would have to purchase equipment, for sending and receiving data, that is compatible with U.S. West's existing equipment. AT & T/MCI contend that this equipment is inefficient and, besides, they already have their own equipment. The PUC sided with AT & T/MCI and required U.S. West to provide access to its dark fiber.

█ The court agrees with the PUC's determination that dark fiber is a "network element" that must be unbundled. Although dark fiber is not presently being used to provide telecommunications services, the same argument could be made with regard to switching or other excess capacity. This fiber is not just sitting in a warehouse, but is in the field ready for use once the appropriate electronics are installed on either end. The record also contains sufficient evidence to support the PUC's determination that the failure to unbundle dark fiber would materially impair AT & T/MCI's ability to interconnect or to offer local service.

US West also argues that dark fiber is spare capacity. If AT & T/MCI are allowed to commandeer it, then U.S. West will have to spend a lot of money building additional capacity (for no reason other than to provide capacity for their competitors). Perhaps so, but this is a recurrent theme that is inherent in the Act's underlying scheme which forces an ILEC to let competitors use the ILEC's own infrastructure to compete against it. US West has not challenged the constitutionality of the Act itself.

Finally, U.S. West argues that the location of its dark fiber is confidential because it would reveal to competitors where U.S. West intends to expand, and whether it has the transmission capacity to compete in a given location, which would help competitors plan their own strategies. However, it does not appear that U.S. West raised this concern to

the arbitrator. The court declines to consider it now for the first time.

### 7. *Collocation*

#### A. Remote Switching Unit

US West objects to provisions in the AT & T/MCI Agreement that permit collocation of Remote Switching Units ("RSU") (also known as Remote Switching Modules ("RSM")). 47 U.S.C. § 251(c)(6) provides for "physical collocation of equipment *necessary* for interconnection or access to unbundled network elements at the premises of the local exchange carrier ...." (emphasis added). The FCC has defined "necessary" to mean simply that such equipment is "used" or "useful," not that it is "indispensable." Local Competition Order, ¶ 579.[9]

US West argues that collocation of an RSU is not "necessary" for interconnection and warns that there is the potential for misuse of that equipment.

█ The FCC has declined to routinely require collocation of "switching" equipment. Local Competition Order, ¶ 581. However, because such equipment can be used for other purposes, the FCC left it up to local PUC's to determine the purpose being served by the particular piece of equipment at issue. The arbitrator approved collocation, finding that the proposed RSUs "will substantially increase efficiency in the transmission and routing [of] telecommunications traffic ... [without] occupy[ing] a significant amount of space or power." Arbitrator's Decision (ARB 3/6), p. 6. U.S. West has not shown that this finding was arbitrary and capricious.

US West also argues that a collocated RSU could be misused to avoid payment of switched access charges. The PUC acknowledged this concern but decided that the danger of abuse was minimal in this instance. PUC Order No. 97–003, p. 5. The court will defer to the PUC's judgment on that question.

---

**9.** The court's dictionary defines "necessary" as "essential" and "necessaries" as "items ... that cannot be done without ...." Webster's Third New International Dictionary (1981), p. 1510. Apparently, the FCC consulted a different dictionary.

### B. Off–Premises Collocation (e.g., in vaults)

US West objects to a requirement that it provide physical collocation in locations outside its offices, such as vaults. It argues there may not be enough room in these locations, or that it may not be feasible to subdivide them.

The PUC responds that if any particular collocation request implicates feasibility concerns, U.S. West can bring the matter to the PUC pursuant to the dispute resolution clause in the Agreement. With that understanding, the court affirms the PUC's decision.

### 8. *US WEST DEX (Directories)*

The AT & T/MCI Agreement imposes various requirements (regarding telephone directories and related services) on U.S. West DEX, which publishes the directories in question. US West Communications, Inc., the plaintiff in this action, objects to those requirements on grounds that U.S. West DEX is a separate corporation (albeit both are wholly owned subsidiaries of a holding company called U.S. West, Inc.), U.S. West DEX was not a party to the arbitration or the interconnection Agreement, and because the PUC allegedly has no authority over U.S. West DEX since the latter company is not a provider of telecommunications services.

■ US West has pled itself out of court, because it lacks standing to assert the rights of a third party, U.S. West DEX. Plaintiff has not alleged any injury to itself. There will be time enough to resolve this question if a proceeding is commenced against either U.S. West or U.S. West DEX for failure to comply with the challenged requirements. At oral argument, the parties also indicated that this claim is probably moot because U.S. West DEX has now entered into contractual arrangements with AT & T and MCI. Therefore, the court will dismiss this claim without prejudice.

### 9. *Resale of Business Services to Residential Customers*

Despite the broad heading, the only issue briefed by the parties concerns the resale of CENTREX. Unfortunately, the parties cannot even agree on whether the Agreements allow or prohibit the resale of business services to residential customers. The court will not attempt to reconcile those conflicting interpretations of the Agreement, but instead will leave that task to the PUC or the contractual dispute resolution process.

Turning to the merits, most cross-class restrictions are presumed to be unreasonable, but this presumption can be rebutted by "prov[ing] to the state commission that the restriction is reasonable and nondiscriminatory." 47 C.F.R. § 51.613(b). *See also* Local Competition Order, ¶¶ 939, 964.

■ US West's briefs in this court never fully explain why it objects to the sale of CENTREX to residential customers. US West offers only vague suggestions that a reseller might abuse CENTREX by using it to bypass access and toll charges or that the resale of CENTREX to residential customers would disrupt the averaged pricing scheme for residential service. Perhaps these technological issues are obvious to U.S. West, but they are not obvious to persons outside the industry. Since this is an issue that implicates the PUC's expertise and discretion, and U.S. West has not demonstrated that the PUC's decision was arbitrary and capricious, the court will not disturb the agency's decision.

### 10. *Performance Standards, Technical Specifications, Penalties, Forced Modifications to Network, Superior Quality*

US West contends that it is being forced to provide service to AT & T and MCI that exceeds both the levels of performance that U.S. West provides to itself as well as the service standards established by Oregon law. US West also contends that the Agreements contain numerous provisions that require U.S. West to alter its network and modify its operations to cater to the demands of AT & T and MCI.

Generally speaking, AT & T and MCI have the right to interconnect with the existing U.S. West network, not to some ideal network that they want U.S. West to build for

their benefit. AT & T and MCI are not entitled to service that exceeds either the levels of performance that U.S. West actually provides to itself, or minimum state requirements, whichever is higher. Nevertheless, U.S. West may be required to modify its existing network or operations "to the extent necessary to accommodate interconnection or access to network elements." *Iowa Utilities*, 120 F.3d at 813, n. 33. Interconnection agreements may also establish procedures and protocols for interfacing between the parties. Finally, if U.S. West upgrades its own network (or would do so upon receiving a request from a customer), it may be required to make comparable improvements to the facilities that it provides to its competitors to ensure that they continue to receive at least the same quality of service that U.S. West provides to its own customers.

The arbitrator specifically declined to adopt AT & T's proposed performance standards and remedies, but did agree that U.S. West "should be required to prepare detailed specifications showing all of its existing service quality and performance standards ... [in order] to provide a benchmark for facilitating resolution of service quality issues." Arbitrator's Decision (ARB 3/6), p. 13. This is simply an informational requirement, so the parties and the PUC have a basis from which to determine whether there even is a problem with the quality of service being provided by U.S. West, and does not impose any specific performance standards on U.S. West. The arbitrator also decided that:

> the supplier performance quality management procedures in § 1–2 of Attachment 11 of AT & T LBO should be implemented. These sections establish a process for determining accountability for service quality, a system for measuring and collecting data, procedures for evaluating service improvements and management interaction, and protocols relating to communication, emergency service restoration and complaint resolution. All of these procedures will be important in resolving service quality issues that will arise as a consequence of the working relationship between these parties.

*Id.* Again, the type of requirements described in the arbitrator's decision are generally not objectionable.

█ However, some of the challenged provisions, such as those in Attachment 3, appear to exceed the limited scope and purpose described by the arbitrator. While some of these provisions may be necessary to establish protocols or measurement standards, permit interconnection, or define terminology, AT & T and MCI also have included in the Agreement other provisions that seemingly require U.S. West to modify its network in order to provide superior quality or enhanced service that AT & T and MCI would like to receive, or to comply with Bellcore (*i.e.*, AT & T) standards. US West is not a division of AT & T. So long as U.S. West is not deliberately employing different standards or procedures in order to hinder competition from other LECs, U.S. West ordinarily has no obligation under the Act to modify its network to comply with AT & T standards and procedures except as described above.

It also is difficult to reconcile the arbitrator's decision, which purported to reject performance standards, with the numerous performance standards contained in Attachment 3 (and other parts) of the Agreement. While the PUC is not precluded from establishing performance standards, the agency's opinion should clearly articulate (1) what the PUC has decided, (2) the reasons for that decision (and, if in doubt, the legal authority relied upon), and (3) whether those performance standards require U.S. West to provide service that exceeds the levels of service that U.S. West provides to its own customers or minimum state standards, whichever is higher.

Given the technical nature of many of the requirements in question, the court will remand this entire issue to the PUC for further proceedings consistent with this opinion.

**11. *Forced Modifications to Facilities, Procedures, and Software***

US West complains that the AT & T/MCI agreements mandate major changes to the U.S. West network, procedures, software, computer systems, etc., in order to comply

with AT & T/MCI demands. In particular, U.S. West is required to adopt AT & T/MCI's billing software (called IABS) instead of the CRIS system that U.S. West presently uses, and U.S. West must adopt AT & T/MCI's proposed electronic network interface. US West again argues that AT & T/MCI are entitled to access U.S. West's existing network—for better or worse—not some ideal network that AT & T/MCI would like U.S. West to build for them.

 The electronic network interface is the mechanism through which service orders are placed. US West proposed an Internet-based interface for use by AT & T/MCI. However, AT & T/MCI contend, and the arbitrator agreed, that U.S. West's proposed interface is deficient because it would require manual inputting and web-surfing, whereas U.S. West accomplishes the same tasks automatically through its in-house computers. The court's understanding is that this interface is not an existing software system but one that U.S. West is developing specifically for use by CLECs. Consequently, it is not a question of altering U.S. West's existing network but of determining how U.S. West and the CLECs will communicate with each other for purposes of interconnection. Therefore, the PUC did not exceed its authority when it decided to adopt AT & T/MCI's proposed communication protocol after concluding that U.S. West's proposal was inadequate for the task.

The debate over IABS v. CRIS is another matter. US West already uses CRIS as its billing software, and sees no reason why it should switch to another software program, and incur what it contends would be substantial costs to modify its systems and retrain its employees, merely because AT & T/MCI prefer IABS.

 The Act requires U.S. West to give AT & T/MCI nondiscriminatory access to U.S. West's billing software, see *Iowa Utilities,* 120 F.3d at 808–10, and that is precisely what U.S. West has proposed to do. MCI asserts that IABS is a better product than CRIS. Even if that were true, it would not make U.S. West's actions "discriminatory." MCI would have access to the very same software that U.S. West uses on the same

terms that it is made available to other CLECs.

The arbitrator did not find that CRIS was grossly inadequate, or that AT & T/MCI would be unable to use the output from CRIS. Rather, the arbitrator adopted AT & T/MCI's proposal because it furthered the "goal of developing standardized, national interfaces for OSS functions." Arbitrator's Decision (ARB 3/6), p. 11. The court is not aware of any provision in the Act that establishes such a goal or that mandates the establishment of a unitary national standard.

It is possible that state law may authorize the PUC to decide what software systems U.S. West should adopt in furtherance of a "goal of developing standardized, national interfaces for OSS functions." If so, then the PUC could incorporate such a requirement in these interconnection Agreements so long as it did not conflict with any federal laws or requirements.

Therefore, the court will remand this issue to the PUC to clarify the authority under which it acted.

**12. *Count IV(D) "Additional Contract Provisions Beyond the Scope of the Act"***

These issues were not discussed in U.S. West's briefs. Accordingly, the court deems them to have been withdrawn.

**13. *Count IX (due process)***

US West's due process claim primarily alleges that there was insufficient evidence in the record to support the challenged decisions. To the extent that this court has affirmed those decisions, the claim necessarily fails.

**14. *Count X (taking)***

US West's taking claim does not seek compensation for a completed taking, but rather alleges that a taking will result if the PUC's decision is affirmed and U.S. West receives less compensation for services than the amount to which it allegedly is entitled. US West also urges this court to construe the Act so as to avoid a taking.

The court rejects defendants' contention that this claim must be dismissed because U.S. West has not exhausted state compensation remedies. It is doubtful that the state courts would have jurisdiction over such a claim, since the federal courts have exclusive jurisdiction over challenges to the interconnection agreements arising from the Act. 47 U.S.C. § 252(e)(4) and (e)(6). The takings claim is essentially the flip side of a challenge to the terms of the interconnection agreement (or a challenge to the Act itself).

 Nevertheless, the taking claim fails because no taking has yet occurred. No evidence has been presented to this court to show that any services were purchased pursuant to this Agreement, nor is there any assurance that services ever will be purchased. Even if the AT & T, MCI, and Sprint do purchase services, the details of those purchases are as yet undetermined. For instance, it is not clear whether they will purchase finished services or unbundled elements, or whether they will purchase services for residential or business use. In addition, a number of the prices and terms are clearly denominated as interim and subject to revision by the PUC once additional information is obtained.

 Finally, since the Act mandates that U.S. West receive just and reasonable compensation, a determination by this court that the Agreement complies with the Act (or setting aside a provision that does not comply with the Act) is fatal to any claim that U.S. West's property has been taken without just compensation.

### ORDER

AT & T and MCI's joint motion to strike extra-record evidence (docket # 62) is DENIED. The motions for summary judgment by plaintiff U.S. West (docket # 55), and by defendants PUC and the Commissioners (docket # 72), Sprint (docket # 73), AT & T (docket # 78), and MCI's memorandum (docket # 82) which the court construes as a motion for summary judgment, are each GRANTED IN PART AND DENIED IN PART.

Summary judgment is GRANTED FOR PLAINTIFF U.S. WEST on Count VI. The PUC must revise the AT & T/MCI agreement to provide for reciprocal access to poles, ducts, conduits, and rights-of-way. Summary judgment is GRANTED FOR DEFENDANTS on the following issues:

(1) part of Count I (interim loop price, resale discount, bill-and-keep method of compensation when calls are completed on another LEC's system and for interim number portability costs, single point of interconnection, use of BFR process for subloop unbundling, special construction charges, recovery of interconnection start-up costs);

(2) part of Count IV (collocation of RSU's, off-premises collocation, electronic network interface, miscellaneous provisions that U.S. West contends are beyond the scope of the Act);

(3) Count V (dark fiber);

(4) Count VII (resale of business services to residential customers);

(5) Count IX (due process); and

(6) Count X (taking).

The following issues are REMANDED TO THE PUC FOR RECONSIDERATION (or clarification):

(1) part of Count I ("final" or UM 844 loop price);

(2) Count II (recombination of unbundled elements and prohibitions upon separating elements);

(3) Count III (performance standards, etc.);

(4) part of Count IV (required modification of facilities, billing software); and

(5) Count VII (division of long distance access revenue for calls ported to CLECs).

The portion of Count IV regarding directory services and requirements imposed upon U.S. West DEX is DISMISSED WITHOUT PREJUDICE.

IT IS SO ORDERED.