US WEST COMMUNICATIONS, INC., Plaintiff,

v.

AT & T COMMUNICATIONS OF THE PACIFIC NORTHWEST, INC.; MCIMetro Access Transmission Services, Inc.; Sprint Communications Company, L.P., a limited partnership; The Public Utility Commission of Oregon and Roger Hamilton, Ron Eachus and Joan H. Smith, as members of the Public Utility Commission in their Official Capacity, Defendants.

No. Civ. 97–1575–JE.

United States District Court, D. Oregon.

May 3, 1999.

Lawrence H. Reichman, Chin See Ming, Perkins Coie, Portland, OR, Sherilyn C. Peterson, Kirstin S. Dodge, Perkins Coie, Bellevue, WA, Norton Cutler, U.S. West Communications, Inc., Denver, CO, for plaintiff U.S. West Communications.

John F. McGrory, Mark P. Trinchero, Keith L. Kutler, Davis Wright Tremaine, Portland, OR, Daniel M. Waggoner, Kraig L.M. Baker, Davis Wright Tremaine, Seattle, WA, Maria Arias–Chapleau, Rebecca B. DeCook, AT & T Communications of the Pacific Northwest, Inc, Denver, CO, for defendant AT & T Communications.

Lisa F. Rackner, Roy Pulvers, Lindsay Hart Neil & Weigler, Portland, OR, Mark B. Ehrlich, Thomas F. O'Neil, III, William Single, IV, MCI WorldCom Inc, Washington, DC, Maureen F. Del Duca, Donald B. Verrilli, D. Scott Barash, Douglas H. Hsiao, Jenner & Block, Washington, DC, for defendant MCImetro Access.

Eric R. Todderud, Heller Ehrman White & McAuliffe, Portland, OR, David P. Murray, A. Renee Callahan, Wilkie Farr & Gallagher, Washington, DC, for defendant Sprint Communications.

Michael T. Weirich, W. Benny Won, Department of Justice, General Counsel, Salem, OR, for Roger Hamilton, Ron Eachus, Joan H. Smith, and Oregon Public Utility Commission.

Philip D. Barz, Emily M. Sweeney, Theodore C. Hirt, Leslie V. Batchelor, U.S. Department of Justice, Civil Division, Washington, DC, Herbert C. Sundby, U.S. Attorneys Office, Portland, OR, for amicus curiae Federal Communications Commission.

## OPINION AND ORDER

JELDERKS, United States Magistrate Judge.

Plaintiff U.S. West Communications, Inc. ("US West") brings this action against AT & T Communications of the Pacific Northwest, Inc. ("AT & T"), MCImetro Access Transmission Services, Inc. ("MCI"), Sprint Communications Company ("Sprint"), the Oregon Public Utility Commission ("PUC"), and PUC Commissioners Roger Hamilton, Ron Eachus, and Joan Smith. The Federal Communications Commission ("FCC") has participated in this proceeding as *amicus curiae*.

The dispute concerns interconnection agreements between U.S. West and AT & T, MCI, and Sprint, respectively. Since the agreements with AT & T and MCI are almost identical, and were considered together by the arbitrator and PUC, they will collectively be referred to as "the AT & T/MCI Agreement" except where necessary to differentiate between them.

This court previously ruled on the parties' cross-motions for summary judgment. *US West Communications, Inc. v. AT & T Communications of the Pacific Northwest, Inc.,* 31 F.Supp.2d 839 (D.Or.1998). However, before entry of final judgment, the Supreme Court decided *AT & T Corp. v. Iowa Util. Bd.,* — U.S. ——, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999). This court then requested supplemental briefing to determine the effect, if any, upon this case of the Supreme Court's decision.

### 1. Effect of the Recent Supreme Court Decision

At issue in *AT & T* was the validity of numerous regulations that the Federal Communications Commission ("FCC") promulgated in 1996 to implement the Act. The regulations were to take effect on September 30, 1996. *See* 61 Fed.Reg. 45,-476 (1996). On September 27, 1996, the Eighth Circuit temporarily stayed "the effective date" of all of the regulations. *Iowa Util. Bd. v. Federal Communica-*

*tions Comm'n,* 96 F.3d 1116, 1118 (8th Cir.1996). On October 15, 1996, the Eighth Circuit allowed some of the regulations to go into effect, but continued to stay the FCC's pricing regulations (47 C.F.R. §§ 51.501–51.515, 51.601–51.611, 51.701–51.717) and the "pick-and-choose rule" (§ 51.809).[1] *Iowa Utilities Bd. v. FCC,* 109 F.3d 418, 427 (8th Cir.1996). The Supreme Court rejected several requests (from the FCC and others) to vacate the stay.[2]

On July 18, 1997, the Eighth Circuit vacated many of the stayed FCC regulations on the ground that the FCC lacked jurisdiction to issue them. *Iowa Util. Bd. v. FCC,* 120 F.3d 753 (8th Cir.1997). The Eighth Circuit also vacated several other regulations on the merits (including at least one that had not been stayed), while affirming still others. *Id.* The stay expired once that order became effective. *Id.* at 820.

Meanwhile, the Agreements at issue here were approved by the PUC, and signed by the parties, after various disputes were resolved through arbitration. The arbitrator issued his decision regarding the Sprint Agreement on January 15, 1997, and the PUC affirmed that decision, with minor modifications, on February 14, 1997. US West's petition for reconsideration was denied on May 30, 1997. On June 13, 1997, the PUC approved the executed Sprint Agreement. All of these events occurred after the FCC regulations had been stayed, but before the Eighth Circuit issued its decision on the merits. The PUC treated the stayed regulations as persuasive, but not binding, authority.

The AT & T/MCI Agreement followed a similar path. The arbitrator issued his decision on December 6, 1996, and the PUC affirmed that decision, with minor modifications, on January 6, 1997. US West's petition for reconsideration was denied on April 23, 1997. Approval of the final, signed contract was delayed for several months because of a dispute over the wording. On August 25, 1997, the parties filed executed Agreements, which the PUC approved on or about September 9, 1997. As with the Sprint Agreement, the PUC treated the stayed FCC regulations as persuasive authority that the PUC could, but was not required to, follow.

On October 14, 1997, the Eighth Circuit clarified its prior decision and order in response to a petition for rehearing. *Iowa Utilities,* 120 F.3d 753.

On November 4, 1997, U.S. West, MCI, and AT & T each asked this court to review certain disputed portions of the Agreement.[3] On January 26, 1998, the Supreme Court granted *certiorari* to review portions of the Eighth Circuit's decision. On December 10, 1998, this court ruled on the motions for summary judgment.

On January 25, 1999, the Supreme Court issued its decision in *AT & T,* —— U.S. ——, 119 S.Ct. 721, 142 L.Ed.2d 835. The Supreme Court reversed the Eighth Circuit's decision regarding jurisdiction and held that the FCC did have jurisdiction to promulgate the regulations in question. It remanded that case to the Eighth Circuit to consider various challenges to the merits of those regulations. The Supreme

---

1. On November 1, 1996, the Eighth Circuit lifted the stay as to a few rules, none of which are applicable to this case. *Iowa Utilities,* No. 96–3321 (lead case) ("Order Lifting Stay in Part").

2. *FCC v. Iowa Util. Bd.,* 519 U.S. 978, 117 S.Ct. 429, 136 L.Ed.2d 328 (1996) (denying request presented to Justice Ginsburg) and at —— U.S. ——, 117 S.Ct. 378, —— L.Ed.2d —— (1996) (denying request presented to Justice Thomas); *Association for Local Telecom.*

*Services v. Iowa Util. Bd.,* 519 U.S. 978, 117 S.Ct. 429, 136 L.Ed.2d 328 (1996) (denying request presented to Justice Stevens) and at —— U.S. ——, 117 S.Ct. 378, —— L.Ed.2d —— (1996) (denying request presented to Justice Thomas).

3. AT & T and MCI's claims were filed as separate actions entitled *AT & T v. U.S. West,* CV 97–1578–JE, and *MCI v. U.S. West,* CV 97–1576–JE.

Court affirmed several other regulations on the merits, while vacating at least one (and probably two) additional regulations. This court must now determine how the Supreme Court's decision affects the instant case and, in particular, how it affects these interconnection agreements which were approved by the PUC and signed by the parties more than a year before the Supreme Court issued its decision.

■ To the extent that the Supreme Court simply explained what the Act or the FCC's implementing regulations mean, this court must apply that interpretation when reviewing the challenged provisions of these interconnection agreements. When a federal court interprets a law— whether it be a statute, a regulation, the common law, or the Constitution itself— the court is not creating new law but merely declaring what that law has always meant, even if this interpretation had not previously been acknowledged or conflicts with an earlier interpretation. *See Rivers v. Roadway Express, Inc.,* 511 U.S. 298, 312–13, 114 S.Ct. 1510, 128 L.Ed.2d 274 (1994) ("A judicial construction of a statute is an authoritative statement of what the statute meant before as well as after the decision of the case giving rise to that construction"); *Harper v. Virginia Dept. of Taxation,* 509 U.S. 86, 107, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993) (Scalia, J., concurring) (when overruling prior precedent a judge does "not pretend to make a new law, but to vindicate the old one from misrepresentation").

■ The regulations that had been vacated by the Eighth Circuit are a different matter, however. The Eighth Circuit stayed those regulations (with limited exceptions) before they ever went into effect, postponing their effective date. *See Iowa Utilities,* 96 F.3d at 1118 (staying "effective date"). *See also* 5 U.S.C. § 705 (expressly authorizing reviewing court to "postpone the effective date of an agency

action ... pending conclusion of the review proceedings"). Ultimately, the Eighth Circuit vacated the regulations. The term "vacate" means "to annul; to cancel or rescind; to declare, to make, or to render, void; to defeat; to deprive of force; to make of no authority or validity; to set aside." *Action on Smoking & Health v. Civil Aeronautics Board,* 713 F.2d 795, 797 (D.C.Cir.1983).

As the PUC acknowledges, "[t]he upshot is that [these] regulations were not effective at the time the interconnection agreement at issue was crafted." The FCC concurs. *See* Supplemental Brief of the FCC as *Amicus Curiae* in CV 97–857–JE, at 6 ("Of course, the FCC's pricing rules were not in effect as a binding mandate when the state commission issued its decision here.") As of this writing, it is unclear whether the Eighth Circuit will stay those regulations anew while it considers various challenges to the merits of those rules.

Even if the Eighth Circuit does not extend the stay, MCI and AT & T nevertheless are asking this court to overturn portions of these interconnection Agreements on the ground that the PUC failed to apply substantive regulations that were not in effect when these Agreements were approved by the PUC and signed by the parties. The court declines that invitation.

The FCC regulations in question go beyond merely interpreting the statute. They create new legal obligations that have the force of law in their own right.[4] The court perceives a crucial distinction between applying a new interpretation of a law that was in effect during the relevant time period, versus applying a substantive regulation that never was in effect to begin with. *Cf. Rivers,* 511 U.S. at 311, 114 S.Ct. 1510 (declining to apply new legislative enactment retroactively and reiterating general principle that statutes operate

---

4. If a regulation does nothing more than interpret a statute, there would be no need for the regulation to carry its own "effective date." Logically, it would relate back to the effective date of the statute.

only prospectively); *Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 208–09, 215, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988) (refusing to apply substantive regulations retroactively).

MCI and AT & T essentially are asking this court to treat the stay, and the Eighth Circuit's subsequent order vacating the FCC regulations, as if those events had never occurred and the FCC regulations were continuously in effect. They have not cited a single case that suggests this court has the power to do this, or that it should exercise that power in this circumstance.

In an effort to bring this case within the ambit of the *Harper* retroactivity rule, MCI and AT & T argue that the Supreme Court was interpreting a statute when it determined that the FCC had jurisdiction to issue these rules, hence the FCC always did have jurisdiction. It is a clever argument, but to no avail. The question is not whether the Eighth Circuit was correct in holding that the FCC lacked jurisdiction, but whether the Eighth Circuit's orders staying and subsequently vacating those regulations were effective. Reversal of the orders on the merits does not negate the fact that they were valid, effective orders.[5]

AT & T and MCI's argument can carry the day only if the Eighth Circuit's orders were void *ab initio,* which they clearly were not. Although ultimately reversed on the merits, no one has suggested that the Eighth Circuit lacked the authority to issue the stay delaying the effective date of the regulations. *See* 5 U.S.C. § 705. A stay would be a hazardous procedural device if liability could be premised upon violating a rule while it had been vacated or stayed.[6]

Furthermore, a prerequisite to application of the *Harper* retroactivity rule is that the case announcing the new rule has itself applied that rule to the litigants in that case. *See Harper,* 509 U.S. at 97, 113 S.Ct. 2510 ("When this Court applies a rule of federal law to the parties before it …"). *See also Reynoldsville Casket Co. v. Hyde,* 514 U.S. 749, 752, 115 S.Ct. 1745, 131 L.Ed.2d 820 (1995) ("when (1) the Court decides a case and applies the (new) legal rule of that case to the parties before it, then (2) it and other courts must treat that same (new) legal rule as 'retroactive' "). In that circumstance, fairness requires that other similarly situated litigants receive equal treatment, not just the litigant whose case happened to be the one in which the rule was first announced. *See James B. Beam Distilling Co. v. Georgia,* 501 U.S. 529, 538, 111 S.Ct. 2439, 115 L.Ed.2d 481 (1991) (plurality opinion); *Griffith v. Kentucky,* 479 U.S. 314, 323, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987).

That prerequisite is not present here. The Supreme Court did not announce a new rule of law and apply it to a particular interconnection agreement, which arguably might entitle other litigants to seek equal treatment. Instead, the Court ruled upon an abstract facial challenge to the FCC's jurisdiction to promulgate these regulations, and did not apply any of those regulations to a specific interconnection agreement. Nor, on remand, will the Eighth Circuit apply these regulations to any particular interconnection agreement. The litigants in the case decided by the Supreme Court will be treated no differently than

---

5. Thus, it is well established that a person can be held in contempt of court for violating a court order that was subsequently reversed. *See Walker v. City of Birmingham,* 388 U.S. 307, 313–14, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967). The question is not whether the court's order was justified on the merits but whether the court had jurisdiction to issue it.

6. Although liability is not implicated in this case, the court sees no reason why the rule should apply only in such instances. Consider, for instance, a court order enjoining a person from assuming the post of mayor of a city. If that order is later overturned, would all acts by the person while the order was in effect now be deemed to have been the acts of the mayor of the city?

the litigants in any other pending case raising the same issues.

The authorities cited by AT & T and MCI are not on point. *Pope v. Shalala*, 998 F.2d 473, 483 (7th Cir.1993), and *Pennzoil Co. v. United States Dept's of Energy*, 680 F.2d 156 (Em.App.1982), each concerned an agency's interpretation of its own existing regulations. The agency was not changing the law but stating what, in the agency's opinion, the law had always meant. In *Appalachian States Low-Level Radioactive Waste Comm'n v. O'Leary*, 93 F.3d 103, 113 (3d Cir.1996), the rule at issue was not a substantive regulation but an interpretive rule expressing the agency's view of what the statute meant. *Id.* at 112–13. Here, by contrast, the FCC was imposing new substantive requirements, which is why the effective date of the regulations matters.

*Thorpe v. Housing Authority of the City of Durham*, 393 U.S. 268, 282, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969), is inapposite as well. At issue was whether a public housing authority must inform a tenant of the reasons why she is being evicted. While the action was pending, a new regulation went into effect which specifically required such notice. Since the tenant had not yet been evicted, the Court instructed the defendant to comply with the regulation and give her notice, thereby avoiding the need to decide whether such notice is mandated by the Constitution. That is an entirely different situation than the one presented here. To the extent *Thorpe* implies that regulations routinely are applied retroactively, that dictum has been severely limited by subsequent decisions. *See, e.g., Georgetown Univ. Hosp.*, 488 U.S. at 208–09, 215, 109 S.Ct. 468. *Thorpe* also suggests that courts must always apply the

law as it presently exists, but that is an oversimplification. *Cf. Landgraf v. USI Film Products*, 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) (provisions of Civil Rights Act of 1991 did not apply to pending cases premised on events occurring before the effective date of the Act).[7]

The cases cited by Sprint are somewhat closer to the mark, but distinguishable nevertheless. In each of those cases, the Ninth Circuit held that the Sentencing Guidelines were applicable to crimes committed, pleas entered, or sentences imposed during the period between the Ninth Circuit's decision holding the Sentencing Reform Act ("SRA") unconstitutional, and the Supreme Court's reversal of that decision. *See, e.g., United States v. Kincaid*, 898 F.2d 110, 111 (9th Cir.1990); *United States v. Gonzalez–Sandoval*, 894 F.2d 1043, 1053 (9th Cir.1990); *United States v. Kane*, 876 F.2d 734, 735–36 (9th Cir.1989).

In the SRA cases, the underlying conduct was always illegal, and a statutory penalty was in place, regardless of whether the SRA was constitutional. Here, by contrast, a contract that complied with all laws in effect at the time would retroactively be deemed to have violated a regulation that was not in force at the time.

Second, unlike the present case, the Ninth Circuit did not issue a nationwide stay postponing the effective date of the SRA, nor did that court vacate the statute. Rather, the SRA went into effect, and at all times remained on the books; the Ninth Circuit simply declined to apply the statute, believing it to be contrary to the Constitution. By contrast, the regulations at issue here never went into effect. The Eighth Circuit first delayed their effective date for nearly a year, and then vacated them. That is a critical distinction.

---

7. *Cf. Twin Pines Coal Co. v. United States Dep't of Labor*, 854 F.2d 1212, 1216 (10th Cir.1988) (applying agency regulations in effect when claimant applied for benefits, not replacement regulations that took effect 18 months later); *Schlett v. Avco Financial Services*, 950 F.Supp. 823, 835 (N.D.Ohio 1996) (refusing to apply regulation that took effect

after events at issue but while action was pending); *Bohrmann v. Maine Yankee Atomic Power Co.*, 926 F.Supp. 211, 218 (D.Me.1996) (applying regulations in effect at time of incident that gave rise to action, rather than revised regulations that took effect while action was pending); *Gregor v. Derwinski*, 911 F.Supp. 643 (W.D.N.Y.1996) (same).

The Supreme Court ultimately disagreed with the Ninth Circuit's determination that the SRA was unconstitutional, and concluded that the Circuit had erred by not applying the law in effect at the time. As with other cases in which a lower court has failed to apply the proper rule, the judgments were reversed and remanded for application of the correct rule. That is not the situation here. The PUC did not fail to apply the law that was in effect at the time; rather, it is accused of failing to apply regulations that were not in effect.

The procedural posture also is different. In the SRA cases, the Ninth Circuit was reviewing a direct appeal from a sentence imposed by the district court. By contrast, this court is reviewing the terms of several contracts approved by an administrative agency.

Finally, the Supreme Court's decision affirming the constitutionality of the SRA applied the rule announced in that case to specific individuals, affecting their sentences. Thus, the *Harper* prerequisite (that the rule has actually been applied to the parties before the Court) was satisfied there, which also distinguishes the SRA cases from the one at hand.

The bottom line is that—despite this court's request for briefing on the issue—the combined forces of MCI, AT & T, Sprint, and the FCC have been unable to cite a single case on point to support their contention that portions of these Agreements must be overturned because the PUC failed to apply certain FCC regulations to Agreements that were entered into more than a year before those regulations took effect.

In addressing a similar issue in *MCI Telecom. Corp. v. GTE Northwest, Inc.,* 41 F.Supp.2d 1157 (D.Or.1999), this court observed that:

A final consideration is that the challenged interconnection agreement has only a two year term and will expire seven months from now. If this court were to remand the entire Agreement (or even large portions of it) to the PUC to begin the process anew, this time applying an entirely new set of rules, there is little doubt that the Agreement would expire and this case would be moot before the PUC could complete its task. The net result would be a significant expenditure of resources by all involved, with very little to show for it in terms of opening local telephone markets to competition. Oregon is not alone in this dilemma. The court is informed that there are numerous similarly situated interconnection agreements around the country, of short duration, many of which undoubtedly would expire before they could be revised to comply with the new FCC rules.

*Id.* at 1165.

The Agreements at issue here are for three-year terms. Each will expire in little over a year from now. Again, it makes little sense to devote the resources of the parties, the court, and the PUC to extensively revising the terms of a contract that will expire soon anyway. Rather, those efforts are better spent on negotiating the replacement contract, which will be subject to the reinstated FCC regulations (assuming they are not stayed again or vacated on the merits).

Nevertheless, the court expresses no opinion as to whether a party may petition the PUC to modify the Agreement once the reinstated FCC regulations take effect, on the ground that there has been a subsequent change of law, or whether the PUC could or should grant such a request. That issue is not presently before this court.[8] Rather, the issue here concerns the parties' respective appeals from the PUC's 1997 decisions concerning these

---

8. The court also does not decide today whether the PUC must apply the reinstated FCC regulations when reconsidering an issue that

has been remanded for other reasons. That question is not properly before the court at this time.

Agreements. The court holds that the PUC did not err by failing to apply FCC regulations that were not in effect at the time the PUC approved these Agreements.

Consequently, the court's prior rulings in this case will not be disturbed unless a different result is compelled (1) by the Supreme Court's interpretation of the relevant statutes and regulations, or (2) because the Supreme Court invalidated an FCC regulation that was applied to these Agreements.

## 2. *Effect of Supreme Court Decision on Specific Issues*

### A. Unbundled Loop Price

There is no reason to modify this portion of the prior decision. *US West v. AT & T*, 31 F.Supp.2d at 844–45. Notwithstanding the arguments advanced by MCI and AT & T, the Supreme Court's decision does not resolve the concerns that led this court to remand the issue for further proceedings. Moreover, even assuming (but not deciding) that loop prices must be based upon a mythical efficient network, as MCI/AT & T contend, there may be considerable room for disagreement over the specifications for this mythical network.

### B. Resale Discount

There is no reason to modify this portion of the prior decision. *Id.* at 845–47. The court also declines AT & T's request to modify the decision (in CV 97–1578–JE) regarding volume and term discounts.

### C. Other Pricing Issues

The court reaffirms its previous decisions regarding compensation for calls to another LEC's system, compensation for interim number portability costs, division of IXC access charges on ported calls, special construction costs, and recovery of interconnection start-up costs. *Id.* at 847–48.

## D. Recombining or Separating Unbundled Network Elements

The court previously directed that this issue be remanded to the PUC for further consideration in light of the Eighth Circuit's decision in *Iowa Utilities*. *US West v. AT & T* at 849. Although the landscape has been altered somewhat by the Supreme Court's decision partly reversing *Iowa Utilities*, a remand is still the best course of action.

47 U.S.C. § 251(c)(3) requires an incumbent local exchange carrier ("ILEC") "to provide . . . access to network elements on an unbundled basis . . . . in a manner that allows requesting carriers to combine such elements in order to provide" telecommunications service. To implement that section, the FCC promulgated 47 C.F.R. § 51.315 ("Rule 315"). Rule 315(b) prohibits an ILEC from separating "requested network elements that the incumbent LEC currently combines" unless asked to by the requesting competitive local exchange carrier ("CLEC"). Rule 315(c) through (f) would have required an ILEC, upon request from a CLEC, to "perform the functions necessary to combine unbundled network elements in any manner, even if those elements are not ordinarily combined in the incumbent LEC's network" and also to "combine unbundled network elements with elements possessed by the requesting telecommunications carrier in any technically feasible manner."

The Eighth Circuit vacated paragraphs (b) through (f) of Rule 315 because it believed those provisions conflict with the text and the overall design of the Act. *Iowa Utilities*, 120 F.3d at 813. Those provisions would, by analogy, allow a CLEC to obtain a finished car for the price of the unassembled parts, but the Act already provides a separate path for CLECs to purchase the finished car for resale. In addition, the Act contemplates that ILECs will supply CLECs with "unbundled" elements, which the CLEC will recombine itself, 47 U.S.C. § 251(c)(3), yet

Rule 315 compelled the ILECs to furnish the elements already combined.

In *AT & T*, the Supreme Court partly reversed the Eighth Circuit, reinstating Rule 315(b). 119 S.Ct. at 737–38. The Supreme Court reasoned that "unbundled network elements" means only that separate prices must be quoted for each element, not that the elements themselves are separated. *Id.* The Court equated separating network elements with "sabotage." *Id.* However, the Eighth Circuit's decision vacating paragraphs (c) through (f) of Rule 315 was not appealed, hence those paragraphs continue to be void.

The first step, in applying the Supreme Court's decision, will be to determine what network elements U.S. West "currently combines" and what that term entails. The Supreme Court decision seems to envision physical combinations of elements, such as the parts in a transmission. However, the court's understanding is that network elements often consist of little more than electronic signals or pulses of light, and the associated software and hardware that generates, processes, and combines those electronic signals and light pulses.[9] Thus, the issue may be more complex than the Supreme Court's opinion suggests. These technical questions should be addressed, in the first instance, by the PUC rather than by this court.

The procedural posture on this issue also favors allowing the PUC to address the matter first. Rule 315 was not among the FCC regulations stayed by the Eighth Circuit on October 15, 1996, which means it was in effect when this Agreement was approved by the PUC, and the Agreement was drafted accordingly. Following the Eighth Circuit's decision vacating most of Rule 315, the PUC ordered the parties to at least one Oregon interconnection agreement (between MCI and GTE) to eliminate provisions that violate the Eighth Circuit's ruling. PUC Order No. 98–467 (Nov. 13, 1998). Before that could be done, the Supreme Court partly reversed the Eighth Circuit, reinstating Rule 315(b). MCI has now asked the PUC to reconsider Order No. 98–467. The PUC's resolution of that motion could moot or alter the posture of this claim.[10]

The court remands this issue to the PUC for such further proceedings as that agency deems appropriate.

### E. Reciprocal Access to Poles, Ducts, Conduits, Rights–of–Way

This court previously concluded that the Act requires CLECs to furnish reciprocal access to poles, ducts, conduits, and rights-of-way. The court declined to follow the FCC's contrary interpretation. *US West v. AT & T*, 31 F.Supp.2d at 849–51. "If the intent of Congress is clear, that is the

9. For instance, FCC Commissioner Powell has said that:
 [T]he network elements that the Commission has held must be "unbundled" are not actually tangible, physical elements that can be unplugged and replugged as easily as an electric cord from a wall socket ... With the exception, perhaps, of loops and ports, the "unbundling" of network elements is not a physical process but a cost allocation fiction. Most UNE's—though representing discrete functional capabilities that one can offer and charge for separately—cannot in any real sense be dissociated from the software and hardware that control their operation ... [W]e should be dedicating our efforts toward crafting a method for allocating costs for UNEs that simulates the fiction of unbundling and rebundling, rather than spending time pretending that

there are actually ways to take these elements apart, hand them to an entrant, and have that entrant put them back together like pieces in a Lego play set.
 *Application of BellSouth Corp. Pursuant to Section 271 of the Communications Act of 1934*, 13 FCCRcd. 539, FCC No. 97–418 (Dec. 24, 1997) (separate statement of Commissioner Powell).

10. The PUC also has been considering whether to order recombination of elements under the authority of state law. See PUC Order No. 98–444 (Nov. 13, 1998), pp. 11–13. The court expresses no opinion on the legality of such a requirement. However, it is an additional reason for this court to wait until the PUC decides how it wishes to proceed in the aftermath of the Supreme Court ruling.

end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron USA Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *Zimmerman v. Oregon Dep't of Justice,* 170 F.3d 1169, 1173 (9th Cir.1999). The Supreme Court's recent decision does not compel a different result.

■ In their supplemental briefs, AT & T and MCI renew their contention that every word of the FCC's First Report and Order [11] is binding upon this court, cannot be questioned, and must immediately be applied to the challenged Agreements. Consequently, they argue, this court is bound by the FCC's interpretation of the Act as expressed in ¶ 1231 of that Report. The court disagrees.

The "final rules" in Appendix B to the First Report are substantive regulations with the force of law. However, the court declines AT & T and MCI's invitation to treat the entire 700 page First Report, and its 3,277 footnotes, as a binding substantive rule, or to parse that document line by line in search of substantive rules hidden within. Rather, the balance of the First Report is best regarded as a mix of commentary and interpretation, in which the FCC articulates its vision of the Act and the justification for the final rules it is adopting (or, in some cases, choosing not to adopt).

There are several reasons for this stance. At the outset, if the body of the First Report is a substantive rule, then it was redundant for the FCC to promulgate regulations as well. Indeed, it invites confusion by creating two sets of standards. Moreover, Congress appears to have contemplated that the FCC would promulgate formal "regulations." *See, e.g.,* 47 U.S.C. § 252(e)(2)(B).

In addition, it often is difficult to discern whether provisions in the body of the First Report create legal obligations. Consider one example: "We *believe* a utility *should* be *expected* to exercise its eminent domain authority ..." First Report and Order, ¶ 1181 (emphasis added). Is that a belief, an exhortation, or an order with the force of law? Under AT & T/MCI's view, the courts would have to analyze each sentence and clause of the entire 700–page First Report to decide whether the FCC intended for it to establish a binding rule of conduct. The better view is that the binding regulations are those that the FCC carefully set out in Appendix B and denominated as "final rules." Those regulations are phrased in mandatory language.

A bright line to identify the binding rules is particularly important here because a federal agency is interfering in the activities and the decisions of state agencies concerning intrastate matters. That, in turn, implicates important principles of federalism. It is essential that the states receive clear notice of any substantive rules that the FCC intends to impose upon them, or that limit their discretion, so they may intelligently decide whether to seek judicial review of those rules or even whether to participate in this federal regulatory program at all.

A further consideration is that an appeal of a final order subject to the Hobbs Act must ordinarily be filed within 60 days. 28 U.S.C. § 2344; *Carpenter v. Department of Transport.,* 13 F.3d 313, 317 (9th Cir. 1994). If the entire 700–page First Report is a substantive rule subject to the Hobbs Act, then anyone who might conceivably be affected—either now or in the future—by any sentence in the entire 700–page First Report would immediately have to file suit or else be barred from doing so in the future. That, in turn, would result in massive litigation, much of which necessarily

**11.** *See Implementation of the Local Competition Provisions in the Telecommunications Act of 1996. First Report and Order,* CC Docket No. 96–98, 11 FCCRcd 15499 (Aug. 8, 1996) ("First Report and Order" or "Local Competition Order").

would be premised upon speculative events and injuries. The Court of Appeals, in turn, would be required to review speculative controversies shorn of the facts that so often help to illuminate difficult issues.

That does not appear to be what Congress intended when it enacted the Hobbs Act. Rather, it appears that Congress primarily envisioned (1) appeals of discrete agency orders altering the rights of the parties, *e.g.*, granting or denying a license, imposing a fine, adopting a tariff, or abandoning a railroad right-of-way, and (2) challenges to agency regulations that impose specific substantive obligations. The Hobbs Act can also apply to certain declaratory orders. *See Wilson v. A.H. Belo Corp.*, 87 F.3d 393, 398 (9th Cir.1996).

The First Report discusses numerous complex issues concerning the implementation of the Act, both now and in the future. It is simply not feasible to address all of them in one judicial proceeding. In *Iowa Utilities*, the parties understandably focused on issues that would immediately impact them, such as the pricing and unbundling regulations. Overlooked in the maelstrom of those complex consolidated cases were other sweeping statements buried in the 700–page First Report whose impact cannot yet be ascertained, but are potentially as significant, particularly from the standpoint of constraining future choices by state public utility commissions.

The 60–day deadline for appeals under the Hobbs Act has long expired. If, as AT & T/MCI contend, each of those statements buried in that 700–page First Report is deemed to be a binding rule subject to the Hobbs Act, then those statements could never be challenged notwithstanding that on their face some of them—such as ¶ 1231—appear to flatly contradict an Act of Congress while the meaning of other statements cannot yet be determined.

In another circumstance, there might still be an opportunity to challenge the rule in the context of an enforcement proceeding, once the rule's significance and application become apparent. *See, e.g.,*

*Commonwealth Edison Co. v. United States Nuclear Regulatory Comm'n*, 830 F.2d 610, 613–16 (7th Cir.1987); *Tri–State Motor Transit Co. v. ICC*, 739 F.2d 1373, 1375 n. 2 (8th Cir.1984). That is not possible here because the FCC does not directly enforce the Act. Rather, the state public utility commissions enforce the Act when they approve or disapprove interconnection agreements, and those decisions are then reviewable by the district courts.

AT & T/MCI's vision of the First Report does not give due weight to the special role the Telecommunications Act assigns to the state public utility commissions and the district courts. This is not the typical Hobbs Act scenario, in which a final FCC action with a specific impact upon a defined petitioner is directly reviewed by the Court of Appeals. Congress established a different model here.

This court has an express statutory duty to determine whether the challenged Agreements comply with the Act. 47 U.S.C. § 252(e)(6). The court is unable to fulfill that duty if it is prohibited from following the plain language of the Act. 47 U.S.C. § 251(b)(4) expressly requires that all local exchange carriers, not just incumbent carriers, provide access to their poles, ducts, conduits, and rights-of-way. The court cannot disregard this explicit Congressional mandate merely because the FCC expressed a different interpretation of the statute in paragraph 1231 of a massive report. To do so would permit the FCC to override the will of Congress, and thwart effective judicial review, merely by issuing a report that opines on so many different topics that it overwhelms the parties and the courts, and which is so vague that it is not always clear where the commentary ends and the substantive rules begin.

The authorities cited by AT & T and MCI are not controlling here. Many, such as *FCC v. ITT World Communications, Inc.*, 466 U.S. 463, 104 S.Ct. 1936, 80 L.Ed.2d 480 (1984), merely hold that the

Courts of Appeal have exclusive jurisdiction over appeals from certain FCC orders. However, that begs the question of whether the language in question is the sort of binding FCC "order" to which the Hobbs Act, 28 U.S.C. § 2342(1), applies. In the instant case, the FCC has not granted or denied a license, imposed a penalty, adjudicated a contested case, or otherwise taken any action that directly affects specific persons or rights. Nor, in this court's view, is the language in question part of a substantive regulation. Consequently, there is no final agency action to be appealed, apart from the regulations in Appendix B and the agency's decision not to enact rules requested by some petitioners.

*Wilson,* 87 F.3d 393, is inapposite. In *Wilson,* the FCC asserted its exclusive jurisdiction over the claims in question. Consequently, the district court lacked jurisdiction. There was a specific agency action altering the rights of the parties, that was reviewable by the Court of Appeals. In addition, once the FCC asserted its exclusive jurisdiction, the district court lacked jurisdiction to try the merits of the controversy. *Id.* Here, by contrast, the FCC does not have exclusive jurisdiction over intrastate telephone service.

The Supreme Court's decision in *AT & T* implicitly supports this court's treatment of the First Report. Although the Eighth Circuit assumed that individual paragraphs of the First Report are subject to affirmance or disapproval, the Supreme Court did not follow that path. Instead, the Court focused solely on the validity of the final regulations in Appendix B of the First Report. To the extent the Court considered the remainder of the First Report at all, it was to discern the reasoning and methodology underlying the final regulations, or the reasons why the FCC had decided not to adopt a particular requirement. *AT & T,* 119 S.Ct. at 735–36. This

is a traditional function of the commentary accompanying a rule.

The Court addressed only one challenge directed at a specific paragraph in the First Report.[12] In ¶ 208 of the First Report, the FCC had claimed the authority to review interconnection agreements approved by state commissions. The Eighth Circuit rejected the FCC's assertion and vacated that part of the First Report. However, the Supreme Court concluded that the Eighth Circuit erred by even reaching the issue, because the claim "is not ripe. When, as is the case with this Commission statement, there is no immediate effect on the plaintiff's primary conduct, federal courts normally do not entertain pre-enforcement challenges to agency rules and policy statements." *AT & T,* 119 S.Ct. at 733 (citations omitted). In other words, as yet the FCC's statement has done nothing to alter the parties substantive rights, but has merely expressed the FCC's interpretation of the Act.

If the entire First Report (as opposed to the regulations adopted with it) has the force of law and is subject to the Hobbs Act, as AT & T and MCI contend, then the Supreme Court seemingly would be required to entertain that challenge now, in view of the 60–day deadline for filing such a challenge. The Court's determination that the challenge was not ripe suggests that the Court does not agree with AT & T and MCI's position. That conclusion is buttressed by the Supreme Court's references to paragraphs of the report as "statements" or "policy statements."

AT & T also relies upon the Eighth Circuit's conclusion that the "fact that the FCC asserts its authority in the commentary section of its First Report and Order as opposed to stating its position as a rule is immaterial. ..." *Iowa Utilities,* 120 F.3d at 803. However, the Supreme Court did not adopt that view. The statement AT & T relies upon was the Eighth Circuit's

12. The Court also considered a challenge to the so-called "all elements rule," but the issue there was not an affirmative requirement but

rather the FCC's decision not to enact a rule that certain incumbent carriers had requested. *AT & T,* 119 S.Ct. at 736.

justification for concluding that the dispute over ¶ 208 was ripe, a conclusion that the Supreme Court unanimously rejected.

When the Supreme Court affirmed or set aside an FCC rule, it did not simultaneously affirm or set aside the corresponding paragraphs in the First Report. Again, the implication is that the only binding substantive regulations are those set forth in Appendix B and specifically denominated as final rules. Otherwise, the Court's decision striking down only the formal regulation would be ineffective, since the corresponding paragraphs in the First Report would continue to impose substantive obligations.

MCI/AT & T also argue that the entire First Report is a binding substantive regulation because the FCC has the power to announce new substantive rules by order rather than by issuing codified regulations. There are circumstances in which an agency can announce a substantive rule by order. *See, e.g., NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 293–94, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974); *SEC v. Chenery,* 332 U.S. 194, 202–03, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947). However, it does not necessarily follow that because the agency has that power, it invoked that power here. The FCC specifically chose to utilize notice and comment rulemaking procedures, and to issue codified regulations describing the substantive rules the agency was establishing. MCI/AT & T would simply ignore that decision and treat the entire 700–page First Report and its 3,277 footnotes as one giant substantive regulation. This court does not find MCI/AT & T's argument persuasive.

Some district courts have treated the First Report commentary as a binding substantive regulation which the district courts may not question. After considering the totality of the circumstances including the structure of the First Report and Order and of the Act, this court respectfully disagrees with those decisions.

Paragraph 1231 of the First Report does not prevent this court from holding that the Act expressly mandates reciprocal access to poles, ducts, conduits, and rights-of-way. As noted in the prior opinion, that determination does not preclude the possibility that the PUC and FCC have other means available to shield a CLEC against a particularly burdensome access request from an ILEC.

### F. Single Point of Interconnection

There is no reason to modify this portion of the prior opinion. *US West v. AT & T,* 31 F.Supp.2d at 851–53.

### G. Subloop Unbundling

In *AT & T,* the Supreme Court invalidated 47 C.F.R. § 51.319 ("Rule 319") and, by implication, 47 C.F.R. § 51.317 as well. *AT & T,* 119 S.Ct. at 734–36. These rules list the network elements that ILECs must unbundle. The Court concluded that the FCC applied the wrong legal standard when it compiled the list. *Id.*

As a result, U.S. West contends that there no longer is any legal basis for the PUC to require subloop unbundling. The court disagrees. The Act remains in effect, as do the agreements between U.S. West and MCI, AT & T, and Sprint. US West must fulfill its existing contractual obligations unless, and until, a court (or the PUC, if appropriate) duly relieves U.S. West of those obligations. This court declines to do so here.

At the outset, the only reference in the Complaint to subloop unbundling is in Count I(F), paragraphs 81 to 83. US West complained that it would incur substantial costs because of subloop unbundling, and the bona fide request ("BFR") process was the only viable way to identify those costs and to ensure U.S. West would be compensated for them. *Id.* Thus, the claim that U.S. West seeks to assert here was not pled in its Complaint.

In its briefs and at oral argument, U.S. West did express concern regarding the technical feasibility of subloop unbundling

at specified locations. Although not pled in the Complaint, the court nevertheless addressed that argument in the prior decision. *US West v. AT & T*, 31 F.Supp.2d at 853.

In its opening brief (though not in its Complaint), U.S. West also asserted that the arbitrator "failed to apply the standards in § 251(d)(2) to determine whether each subloop element must be unbundled, relying instead on the FCC's invalid 'technical feasibility' presumption." US West's Opening Brief at 40–41.

To the extent that U.S. West seeks to renew that argument here, it is without merit. The arbitrator did not simply assume that an element must be unbundled so long as it is technically feasible to do so. Instead, the arbitrator's decision explains why, in his view, local telephone competition in Oregon would be impaired without subloop unbundling. The issue of technical feasibility was discussed because U.S. West raised the issue to justify its contention that subloop unbundling should be permitted only through the BFR process.

If U.S. West believes that either the Supreme Court's decision, or the FCC's replacement for Rule 319, provides new grounds for U.S. West to challenge the terms of these agreements, that argument should be presented in the first instance to the PUC. The court expresses no opinion as to whether the PUC could, or should, entertain that argument, which in essence is a request to reopen these agreements due to an intervening change of law.

### H. Dark Fiber

This court previously rejected U.S. West's argument that dark fiber is not subject to unbundling because it is not "presently" in use. *US West v. AT & T*, 31 F.Supp.2d at 854. The court adheres to that ruling today. However, in light of the Supreme Court's interpretation of the Act, this court agrees that the PUC did not

adequately consider whether MCI has comparable alternatives to using GTE's dark fiber. The court will therefore remand this issue to the PUC for reconsideration.

The court denies MCI's request to hold this issue in abeyance until the FCC issues the replacement for Rule 319. It is the PUC, rather than this court, that should apply the new regulation in the first instance.[13]

### I. What Elements Must be Unbundled

In its supplemental brief, U.S. West makes a number of troubling assertions regarding U.S. West's obligations (or lack thereof) to continue providing unbundled elements in light of the Supreme Court's decision in *AT & T*. By interrupting the flow of network elements to CLECs, or even by sowing seeds of doubt in the minds of customers and competitors as to its intentions in this regard, U.S. West could seriously harm competitors while frustrating the Congressional mandate to promote competition for local telephone service in Oregon.

So there will be no misunderstanding, it is this court's view that U.S. West must continue to honor its contractual commitments to supply network elements to the CLECs, unless and until those obligations are expressly modified by a court or by the PUC. Neither contingency has occurred.

### J. Collocation of Remote Switching Units

 This court previously affirmed the arbitrator's decision to order collocation of Remote Switching Units ("RSUs" or "RSMs"), though the court questioned the FCC's contention that a piece of equipment is "necessary" for interconnection, and collocation must be authorized, so long as the equipment is "used and useful" for that purpose. *US West v. AT & T*, 31 F.Supp.2d at 854, n. 9. The word "neces-

---

**13.** Whether to address this issue now, or else wait until the FCC issues the replacement rule, is a matter that the court will leave to the discretion of the PUC.

sary" suggests a stricter standard. Anyone who has ever packed for a trip knows the difference between items that might be "used and useful" versus items that are really "necessary." The FCC's loose interpretation of "necessary" seems especially inappropriate when authorizing a physical occupation of the ILEC's property.

In light of the Supreme Court's recent decision, the FCC's interpretation of the word "necessary" in 47 U.S.C. § 251(c)(6) is no longer tenable. *See AT & T,* 119 S.Ct. at 734–36 (rejecting the FCC's application of the "necessary" and "impair" standards in Rules 317 and 319, and declaring that the FCC "has not interpreted the terms of the statute in a reasonable fashion"). Although the FCC's collocation rule, 47 C.F.R. § 51.323 ("Rule 323"), was not directly at issue in *AT & T,* similar defects are present in Rule 323(b). The FCC appears to have applied the same unacceptable definition of "necessary," and the same expansive view of the ILEC's obligations, in Rule 323(b) as it did in Rules 317 and 319. *See AT & T,* 119 S.Ct. at 736. In the aftermath of *AT & T,* it is clear that the FCC will have to reconsider Rule 323(b) as well.

In *MCI v. GTE,* this court remanded this same issue for reconsideration because the "PUC's decision provides little justification for its decision to authorize collocation of RSUs, apart from relying upon the FCC's flawed interpretation of the Act." *Id.,* 41 F.Supp.2d at 1182.

The arbitrator's decision here is better supported than in *MCI v. GTE.* Nevertheless, the court will remand here as well so the PUC may formulate a uniform position on this issue, if it chooses. As in *MCI v. GTE,* if the PUC approves collocation of RSUs, the Agreements should explicitly state the purposes for which this equipment may (or may not) be used, or the absence of such restrictions.

### K. Remaining Issues

The remaining issues in this case are unaffected by the Supreme Court's decision.

### ORDER

The prior opinion and order, filed on December 10, 1998, is reaffirmed except as modified above. Two additional issues are remanded to the PUC for reconsideration: (1) whether dark fiber must be unbundled, and (2) collocation of RSUs. The court will enter final judgment forthwith.

IT IS SO ORDERED.

### JUDGMENT

This matter came on for a hearing on November 6, 1998, on the parties' cross-motions for summary judgment. The court being fully advised, it is ordered and adjudged as follows:

1. Judgment is entered in favor of plaintiff U.S. West on Count VI. The PUC shall revise the AT & T/MCI agreement to provide for reciprocal access to poles, ducts, conduits, and rights-of-way.

2. The following issues are remanded to the Oregon Public Utility Commission for reconsideration (or clarification):

A. Part of Count I ("final" or UM 844 loop price);

B. Count II (recombination of unbundled elements and prohibitions upon separating elements);

C. Count III (performance standards, etc.);

D. Part of Count IV (required modification of facilities, billing software, and collocation of RSUs);

E. Count V (dark fiber); and

F. Count VII (division of long distance access revenue for calls ported to CLECs).

3. The portion of Count IV regarding directory services and requirements imposed upon U.S. West DEX is dismissed without prejudice.

4. Any remaining claims are dismissed with prejudice.